

IN THE DISTRICT COURT OF TULSA COUNTY
STATE OF OKLAHOMA



| | |
|---|---|
| FAYE STRAIN, as Guardian of THOMAS BENJAMIN PRATT, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No.: ) CJ-2019 03458 ) Jury Trial Demanded ) Attorney Lien Claimed |
| ARMOR CORRECTIONAL HEALTH SERVICES, INC., | ) ) ) ) |
| Defendant. | ) ) |

DISTRICT COURT
F I L E D
SEP -5 2019
DON NEWBERRY, Court Clerk
STATE OF OKLA. TULSA COUNTY

REBECCA NIGHTINGALE

## PETITION

**COMES NOW** the Plaintiff Faye Strain ("Plaintiff") as guardian of Thomas Benjamin Pratt ("Mr. Pratt"), and for her Petition against Defendant alleges and states as follows:

### PARTIES

1. Plaintiff Faye Strain is the duly appointed guardian of Mr. Pratt. Plaintiff is also Mr. Pratt's mother.

2. Defendant Armor Correctional Health Services, Inc. ("ARMOR") is a foreign corporation doing business in Tulsa County, Oklahoma and was at all times relevant hereto responsible, through its employees acting within the scope of employment, for providing medical and mental health services and medication to Mr. Pratt while he was housed at the Tulsa County Jail ("Jail") in the custody of the Tulsa County Sheriff's Office ("TCSO").

## JURISDICTION AND VENUE

3. Subject matter and personal jurisdiction are proper in this Court.

4. Prior to bringing the initial case, Plaintiff complied with the tort claim notice provisions of the Oklahoma Government Tort Claim Act ("GTCA"), 51 O.S. § 151, *et seq* by notifying Defendants of her intent to file state law claims in connection with the events and injuries described herein. The GTCA process has been exhausted. This initial action was timely brought pursuant to 51 O.S. § 157.

5. Venue is proper under because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

6. Mr. Pratt was booked into the Jail on December 11, 2015. Mr. Pratt was placed in a general population pod, J-16.

7. At 7:39am on December 12, 2015, Mr. Pratt submitted a medical sick call note, through the Jail's electronic kiosk system, requesting to speak to a nurse about "detox meds". This is clear evidence that by early in the morning of December 12, Mr. Pratt was going into alcohol withdrawal. In any event, this kiosk request was not responded to until two days later.

8. At 12:19pm on December 12, Mr. Pratt submitted a second kiosk request, as follows:

> MY NAME IS TOMMY PRATT I CAME IN YESTERDAY AND STARTED HAVING WITHDRAWLS [sic] I NEED TO TRY AND GET SOME DETOX MEDS
> THANKYOU

9. At approximately 1:05pm on December 12, 2015, Nurse Karen Canter, an employee of Defendant ARMOR and agent of TCSO acting under color of state law and within the scope of her employment, conducted a drug and alcohol withdrawal assessment of Mr. Pratt. As part of this assessment, Mr. Pratt indicated that he had a serious alcohol problem. In particular, Mr. Pratt advised Nurse Canter that he had a habit of drinking 15-20 beers a day for "at least" the past ten (10) years. The assessment tool further indicates that Mr. Pratt was experiencing: *"constant nausea, frequent dry heaves and vomiting"*, moderate tremors, anxiety, restlessness, "drenching sweats" and "severe diffuse aching of joints/muscles."

10. At approximately 1:48pm on December 12, Mr. Pratt was admitted to the Jail's medical unit. Upon admission, Nurse Gracie Beardon, an employee of Defendant Armor and agent of the TCSO acting under color of state law and within the scope of her employment, conducted a "mental health infirmary admission assessment." Nurse Beardon noted that Mr. Pratt's admitting diagnosis was "Detox". Nurse Beardon additionally noted that, upon admission, Mr. Pratt was nauseated, slumped over, anxious, fearful and "unsteady on his feet". Nurse Beardon specifically acknowledged that Mr. Pratt posed a ***"risk for injury"*** due to his detoxification and "high blood pressure".

11. On December 13, 2015, Mr. Pratt was placed on seizure precautions, which included an order that his vital signs be taken every eight (8) hours.

12. At approximately 2:08am on December 14, 2015, another drug and alcohol withdrawal assessment was conducted. This time, the assessment was done by Nurse Patricia Deane, an employee of Defendant ARMOR and agent of the TCSO acting under color of state law and within the scope of her employment. This December 14 drug-and-

alcohol withdrawal assessment clearly indicated that Mr. Pratt's symptoms were worsening and becoming ever more severe. In this regard, the December 14 assessment tool indicates that Mr. Pratt was experiencing: ***"constant nausea, frequent dry heaves and vomiting"***, ***"severe" tremors*** *"even with arms not extended"*, ***"acute panic states as seen in severe delirium or acute schizophrenic reactions"***, restlessness, *"drenching sweats"*, ***"continuous hallucinations"*** and disorientation for "place/or person".

13. This assessment indicated that Mr. Pratt was suffering from delirium tremens, a life-threatening condition related to alcohol withdrawal, which typically requires immediate hospitalization. *See, e.g., Speers v. County of Berrien,* 196 F. App'x 390, 395 (6th Cir. 2006) (***"delirium tremens is a serious medical condition, which generally requires <u>immediate</u> hospitalization..."***); *Thompson v. Upshur Cnty., Tex,* 245 F.3d 447, 457 (5th Cir. 2001) ("delirium tremens is a serious medical need"); *Deaton v. McMillin,* No. 3:08-CV-763-DPJ-FKB, 2012 WL 393053, at *2-3 (S.D. Miss. Feb. 6, 2012).

14. To any moderately trained medical professional, it would be obvious that Mr. Pratt was suffering from delirium tremens. Nevertheless, despite the obvious severity and emergent nature of Mr. Pratt's deteriorating condition, he was not sent to a hospital or even seen by a physician. Indeed, Nurse Deane did not contact a physician, despite the fact that the assessment tool itself mandated that she do so. At this point, Mr. Pratt's detoxification was not being supervised by a physician, as required by Armor policy/National Commission on Correctional Healthcare ("NCCHC") standards. No vital signs were taken. No blood tests were performed. Nurse Deane was negligent.

15. At approximately 3:44am on December 14, 2015, an unidentified ARMOR employee, acting within the scope of his/her employment and under color of state law, attempted to take Mr. Pratt's vital signs. This ARMOR employee noted that when he/she encountered Mr. Pratt he was ***"tearing up"*** his cell and deliriously stating that he was ***"locked in the store"***. Mr. Pratt was so disoriented and panicked that he could not sit still to have his vitals taken. Again, these were clear symptoms of delirium tremens, an emergent and life-threatening condition, requiring immediate hospitalization. It was apparent that Mr. Pratt's withdrawal-related psychosis was getting worse to the point that he posed an imminent threat of self-harm. Still, the ARMOR employee did nothing to assist Mr. Pratt. He was not taken to a hospital. He was not restrained. He did not see a physician or psychiatrist. He was not placed on suicide watch. No blood tests were performed. Rather, Mr. Pratt was left to his own devices, while in the throes of a dangerous withdrawal-related mental breakdown (likely, delirium tremens), alone in a cell. This, too, was negligence.

16. Despite the fact that Mr. Pratt was to have his vital signs taken every eight (8) hours, the ARMOR employees responsible for this task never once recorded a complete set of vital signs for Mr. Pratt. ***No vital signs at all were recorded on December 14, 15 or 16.*** This failure not only violated policy and protocol, but substantively deprived Mr. Pratt's "caretakers" at the Jail of necessary information in monitoring his condition. Indeed, frequent vital signs are essential in monitoring the health and assessing the needs of patients with delirium tremens. ARMOR's inability or refusal to take the minimal step of assessing vital signs is additional evidence of negligence.

17. There are two "Medical Sick Call Notes", dated December 14, 2015, in the "official" Armor medical chart, which were purportedly recorded by Dr. Curtis McElroy. Assuming that Dr. McElroy did see Mr. Pratt on December 14, as represented in the notes, the information in those notes provides additional evidence of negligence.

18. According to the "December 14" note, Dr. McElroy saw Mr. Pratt at around 10:30am. In the December 14 note, Dr. McElroy states:

> Pt seen and evaluated. Came in 12/11/15 with alcohol abuse and placed on Librium protocol for alcohol withdrawal. Pt switched to valium and received first dose this morning. ***Pt reported to be found on floor pulling up tile with approximately 2cm forehead laceration.*** Small, < 1cm laceration left lateral elbow area and a laceration < 1cm on right mid right posterior forearm. Some scratches on dorsum of nose. No other facial injury. Pt awake, ***confused, talking about what movie are we watching tonight.*** No history of witnessed fall or pt inflicting injury to himself. ***Pool of blood under sink in cell.***

(emphasis added). The information that Mr. Pratt, who was known to be detoxing, was found on the floor, with a "pool of blood" under the sink, and "pulling up tile" after suffering some sort of head injury, would be information that even a layperson would recognize as an emergency medical situation. Further, there was additional information, in the medical record, from earlier that morning, that Mr. Pratt was continuously vomiting, hallucinating, suffering from severe tremors and was in an acute panic state. All of this evidence pointed to delirium tremens.

27. Assuming Dr. McElroy did see Mr. Pratt at 10:30am on December 14, it was obvious that Mr. Pratt was experiencing life-threatening withdrawal (delirium tremens) and/or brain injury, and needed to be transferred immediately to a licensed acute care facility. Dr. McElroy's failure to send Mr. Pratt to a hospital evinces negligence toeard his serious and obvious medical and mental health needs. Indeed, Dr. McElroy's failure to

send Mr. Pratt to the hospital under these conditions was a violation of the minimal standards of the NCCHC (J-G-06), which TCSO and Armor have adopted as policy. In addition, Dr. McElroy did not provide Mr. Pratt with any neurological diagnostics or consult, despite the obvious need. And Dr. McElroy did not refer Mr. Pratt to a psychiatrist, despite the obvious need. He did not order vital signs be taken or that Mr. Pratt's blood be tested. These failures too are evidence of negligence.

19. Additionally, assuming that Dr. McElroy saw Mr. Pratt at 10:30am on December 14, 2015, there is no explanation as to why he waited over eight (8) hours after Nurse Deane's dire assessment, and nearly seven (7) hours after the failed attempt to take Mr. Pratt's vital signs, to lay eyes on this patient. It is unconscionable that Mr. Pratt was left to suffer in his cell for this period of time without even seeing a physician. Each passing hour was another lost opportunity to get Mr. Pratt to an emergency room to receive the level of care and assessment he obviously needed. With each passing hour without this ER-level care, Mr. Pratt was inching closer to a medical calamity that would alter the rest of his, and his family's, life.

20. Nurse Margarita Brown, an employee of Defendant ARMOR and agent of TCSO acting under color of state law and within the scope of her employment, encountered Mr. Pratt in the medical unit at around 4:07pm on December 14. Nurse Brown reported that Mr. Pratt was "angry", "anxious" and "confused"; and staring and "reaching into space." Nurse Brown further noted that Mr. Pratt lacked judgment and had "impaired short term memory." Lastly, Nurse Brown charted that Mr. Pratt needed assistance with "activities of daily living." Again, Mr. Pratt was not sent to the hospital in negligemt disregard of his serious medical needs.

21. The failures of the medical staff -- beginning with Nurse Deane's assessment and continuing through Dr. McElroy's dubious "evaluation" and Nurse Brown's observations -- to send Mr. Pratt to an emergency room for medical intervention, or even order neurological testing or a psychiatric visit, constitutes negligence. And this negligence was a proximate cause of Mr. Pratt's unnecessary and prolonged pain and suffering; continuing and permanent disability; and medical expenses.

22. At approximately 8:49am on December 15, 2015, Kathy Loehr, a purported "Licensed Professional Counselor" or "LPC", conducted an initial mental health evaluation of Mr. Pratt. During the evaluation, Mr. Pratt reported that he was "detoxing from alcohol." Ms. Loehr observed that Mr. Pratt was "shaky" and had "difficulty following directions". Mr. Pratt was making "slow, shaky movements." Loehr charted that Pratt "present[ed] with a ***wound on his forehead from a self inflicted injury yesterday***" and that the wound "[a]ppear[ed] unintentional" as Pratt was "detoxing and ***did not appear oriented yesterday***." Notably, Ms. Loehr was unable to complete her evaluation because Mr. Pratt had deteriorated to the point that he had ***"difficulty answering questions."*** Mr. Pratt was clearly still disoriented as he stated his mistaken belief that he was at a detox center and that it was Sunday (when, in fact, December 15, 2015 was a Tuesday). He appeared lethargic with poor eye contact. His ***memory, insight, judgment and concentration were*** all noted to be ***"poor".***

23. Despite Mr. Pratt's obvious signs and symptoms of brain injury, coupled with his ongoing struggle with the effects of delirium tremens, Ms. Loehr did not send Mr. Pratt to a hospital. Mr. Pratt was not seen by a physician. There is no indication that Ms. Loehr even contacted a physician. Instead, demonstrating disregard for the seriousness of

the situation, Ms. Loehr *educated* Mr. Pratt *"on getting clothes"* and reportedly "encouraged vital signs to get medication." In other words, Ms. Loehr provided no care at all, and did nothing to assure that Mr. Pratt's emergent and life-threatening condition was appropriately addressed. This was negligence.

24. There is also a "Medical Sick Call" note, dated December 15, 2015, recorded by Dr. McElroy, in the version of Mr. Pratt's chart later sent to Saint John. According to the December 15 note, which is time stamped at 3:40pm, Mr. Pratt was reported to *"have been found underneath sink [in his cell] with laceration [on] mid forehead."* Taking the December 15 note at face value, coupled with the known history of Mr. Pratt's symptoms of delirium tremens and/or brain injury, Dr. McElroy should have, again, sent Mr. Pratt to a hospital on December 15. His failure to do so was yet another instance of negligence.

25. At approximately 12:00am on December 16, 2016, Nurse LeeAnn Bivins, an employee of Defendant ARMOR and agent of TCSO acting under color of state law and within the scope of her employment, observed that Mr. Pratt *"WOULD NOT GET UP....."* However, Nurse Bivins failed to check Mr. Pratt's vital signs, including his pulse and respiration.

26. Just before 1:00am on December 16, 2015, a TCSO Detention Officer ("D.O.") discovered Mr. Pratt "lying on [his] bed [and] not moving." The D.O. called for a nurse. Angela McCoy, a Licensed Practical Nurse (or "LPN"), an employee of Defendant ARMOR and agent of TCSO acting under color of state law and within the scope of her employment, responded. Upon entering Mr. Pratt's cell, Nurse McCoy found that he had *no pulse or respiration*. He was *completely unresponsive*. She initiated CPR and called a

9

"medical emergency" at around 1:00am. Shortly thereafter, first responders from the fire department and EMSA arrived, and continued CPR. Through these measures, Mr. Pratt was resuscitated at around 1:15am, and was rushed to Saint John Medical Center in Tulsa.

27. According to the EMSA Report, Mr. Pratt had suffered a cardiac arrest. In pertinent part, the narrative portion of the EMSA Report states: (A) "Jail Medical Staff report '[Mr. Pratt] *hit his head **4 days ago**, and has been **non-verbal** and lethargic ever since*'"; (B) "Staff reports [Pratt] has been going through withdrawals, and been on suicide watch as well"; (C) "[Pratt] has a ***large hematoma*** to his forehead, that staff reports '[i]s from his *fall 4 days ago*'".

28. Mr. Pratt was admitted to Saint John, where he remained until January 1, 2016. Upon discharge, Mr. Pratt was diagnosed with: (A) cardiopulmonary arrest (PEA) secondary to presumed seizure during incarceration; (B) acute renal failure: Secondary to hypotension and Rhabdomyolysis; (C) Todd's paralysis; (D) agitation; (E) anoxic brain injury; (F) AKI: Secondary to hypotension and rhabdomyolysis; (G) hyponatremia; (H) transaminitis: Acute; and (I) Head laceration: Acute.

29. Before Mr. Pratt was admitted to the Jail on December 11, 2015, he had no history of seizure disorder, brain damage or severe mood swings. Since suffering from untreated brain injury and delirium tremens which led to cardiac arrest/severe seizures at the Jail, Mr. Pratt is permanently disabled. He continues to suffer from severe seizure disorder, memory loss, extreme mood swings and anger and verbal/communication delays/deficits. He is now unable to work and has been homeless at times. He requires assistance with everyday life activities. He is incapable of safely living on his own. Mr.

Pratt is just 39 years old. At the time of his incarceration, and resulting injuries, Mr. Pratt was 35.

30. Mr. Pratt is permanently disabled and has incurred and will continue to incur lost wages and medical expenses. In addition, Mr. Pratt has suffered and will continue to suffer physical and mental pain and anguish. These injuries and damages are a direct and proximate cause of the negligence as described supra.

## CLAIM FOR RELIEF

### Negligence
### (Defendants ARMOR, McElroy, Deane and Loehr)

31. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 30 as though fully set forth herein.

32. ARMOR, McElroy, Deane, Loehr and the unidentified nurse who encountered Mr. Pratt at approximately 3:44am on December 14, 2015, owed a duty to Mr. Pratt, and all other inmates in custody at the Jail, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

33. ARMOR, McElroy, Deane, Loehr and the unidentified nurse who encountered Mr. Pratt at approximately 3:44am on December 14, 2015, breached that duty by failing to provide Mr. Pratt with prompt and adequate medical and mental health care despite Mr. Pratt's obvious needs.

34. ARMOR, McElroy, Deane, Loehr and the unidentified nurse who encountered Mr. Pratt at approximately 3:44am on December 14, 2015's breaches of the duty of care include, inter alia: failure to treat Mr. Pratt's serious health condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly and

adequately evaluate Mr. Pratt's health; failure to properly monitor Mr. Pratt's health; failure to provide access to medical and mental health personnel capable of evaluating and treating his serious health needs; failure to assure that Mr. Pratt received necessary emergency care; and a failure to take precautions to prevent Mr. Pratt from injury.

35. As a direct and proximate result of ARMOR, McElroy, Deane, Loehr and the unidentified nurse who encountered Mr. Pratt at approximately 3:44am on December 14, 2015's negligence, Mr. Pratt experienced physical pain, severe emotional distress, mental anguish, and the damages alleged herein.

36. As a direct and proximate result of this negligence, Mr. Pratt has suffered, and will continue to suffer, real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

37. ARMOR is vicariously liable for the negligence of its employees and agents.

38. ARMOR is also directly liable for its own negligence.

**PRAYER FOR RELIEF**

39. WHEREFORE, based on the foregoing, Plaintiff prays that this Court grant the relief sought including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, reasonable attorney fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,

*[signature]*

Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Smolen & Roytman
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiff***